16489

CROTTS v. FLETCHER MOTOR CO. *ET AL.*
(64 S. E. (2d) 540)

*Mr. Robert L. Chipley,* of Greenwood, ·for *Appellants,*

*Messrs. Nicholson & Nicholson,* of Greenwood, *for Respondent,*

April 6, 1951.

L. D. LIDE, Acting Associate Justice.

This action was commenced in the Court of Common Pleas for Greenwood County on or about the 20th day of May, 1948, to recover the sum of $595.00 upon a policy of automobile collision insurance. The cause came on to be tried before Hon. M. M. Mann, Presiding Judge, and a jury, at the March, 1949, term, and a verdict was directed in favor of the plaintiff, upon motion of her counsel, except as to the amount of damages; and the jury rendered a verdict in favor of the plaintiff for the sum of $450.00; and the defendants' motion for a new trial, duly made thereafter, was overruled. The case comes to us upon an appeal by the defendants above named from the judgment entered upon the verdict, as well as from a previous order overruling appellants' demurrer to the complaint handed down by Hon. E. H. Henderson, Judge of the Second Circuit, then presiding in the Eight Circuit, dated October 20, 1948.

It may be well to mention, in the interest of a better understanding of the testimony, that the plaintiff has been known at times by three different names. It appears that her name was originally Virginia Rippy but that in connection with the matters involved in this litigation she was sometimes erroneously called Mrs. Edwin Y. Roberts, because she was then engaged to Mr. Roberts. However, she did not marry him, but did marry a Mr. Crotts, and her name is now Mrs. Virginia Crotts.

It should also be mentioned that Edwin Y. Roberts was made a party defendant to this cause, although his name is not mentioned in the above statement; for in due course he

filed an answer to the complaint admitting the allegations thereof, and affirmatively alleging that he left Greenwood, and abandoned whatever interest he had in the automobile in question to the plaintiff; and (quoting) "but if it be construed that he have any legal or equitable interest in the said automobile, he agrees that a settlement with the plaintiff or a judgment in favor of the plaintiff be an effective bar to that interest". Hence wherever the defendants are referred to herein, it will be understood that Mr. Roberts is not included.

In order clearly to understand the controversial issues, it will be necessary to recite at some length the successive events out of which this litigation arose; although there is relatively little dispute in regard to the underlying facts of the case.

On March 4, 1947, the plaintiff and Mr. Roberts went to the place of business in Greenwood of the Fletcher Motor Company, one of the corporate defendants, for the purpose of buying an automobile, and their negotiations resulted in the purchase of a 1938 Ford automobile at the price of $595.00; and there was testimony to the effect that Mrs. Mary C. Davis, the mother of the plaintiff, furnished the amount of the cash payment, to wit, $300.00, which she intended as a weeding present, contemplating that her daughter would marry Mr. Roberts, and this sum of $300.00 was duly paid to the Fletcher Motor Company, leaving a balance of $295.00 due upon the purchase price. Thereupon an arrangement was made by the Fletcher Motor Company with the Commercial Credit Corporation, another one of the corporate defendants, for the financing of the credit portion of the transaction, including the matter of procuring insurance.

While the bill of sale recited that the car was sold to "Mr. and Mrs. Edwin Roberts", Mr. Roberts alone appears to have signed the necessary papers, as shown by the exhibits before the Court, including the conditional sale agreement

which in. legal effect was a purchase money chattel mortgage, securing a note representing the balance due by the purchaser, and covering the car in question. This instrument provides, among other things, that the purchaser shall obtain and keep in force certain insurance on the car.

The note secured by this mortgage was in the principal sum of $387.80, made up of the unpaid balance of the purchase price of $295.00 and "Insurance, Recording and Finance Charges—$92.80". It was further provided in the note and chattel mortgage that this amount was payable in ten equal monthly installments of $38.78 each, "commencing one month from March 4, 1947".

The evidence in behalf of the defendants further shows that the Commercial Credit Corporation financed the transaction for the Fletcher Motor Company, upon the assignment of the necessary papers, by providing for the payment to it of the balance of the purchase price, namely, $295.00, and also by obtaining the required policy of insurance from the Calvert Fire Insurance Company, the other corporate defendant; and that the entire premium for such insurance (alleged as $48.38) was paid in cash to the Calvert Fire Insurance Company by the Commercial Credit Corporation upon the delivery of the policy.

The policy of insurance was numbered 373-873, and insured the automobile against "Collision or Upset"; the amount of the insurance being, "Actual Cash Value less $50.00"; and the insurance was payable to the Commercial Credit Corporation, as the holder of the conditional sale agreement or purchase money chattel mortgage.

The policy also provided for the cancellation thereof, either by the insured or the company; and the conditions relating to cancellation by the company, as contained in the policy, are as follows:

"The policy may be canceled by the company by mailing to the insured at the address shown in this policy written notice stating when not less than five days thereafter such

cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice and the effective date and hour of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the insured or by the company shall be equivalent to mailing."

It is further provided in the policy that after the cancellation thereof the unearned portion of the premium shall be refunded "to the insured".

After the transaction aforesaid differences arose between the plaintiff and Mr. Roberts, and he in consequence thereof left Greenwood and went to North Carolina. He had paid the first installment upon the chattel mortgage, only, and apparently abandoned all interest in the transaction relating to the automobile, leaving it in the possession of the plaintiff, Mrs. Crotts; and all the subsequent payments thereon were made by or for her, although she did not punctually keep up with the payments and was rather constantly in default, so that several letters were mailed to Mr. Roberts at the following address, to wit, "Route 1—Box 113, Greenwood, S. C.", this being his address as stipulated in the chattel mortgage and the insurance policy. These letters urged immediate payment of the balance then due, especially because it was provided in the chattel mortgage that default on any obligation would, without notice, forthwith mature the entire indebtedness.

The letters above referred to, addressed to Mr. Roberts, were actually received by the plaintiff, who opened them, because she knew that they related to the automobile matter in which Mr. Roberts was no longer interested.

The next event of interest herein occurred, according to the evidence, on October 29, 1947, when the Calvert Fire Insurance Company elected to cancel the policy of insurance, pursuant to the provisions thereof, and thereupon wrote to Mr. Roberts at the address aforesaid a letter giving notice that the policy in question was being cancelled as of Novem-

·ber 6, 1947, at ·12 :01 A. M. Standard Time. It further appears from the evidence that on October 30, 1947, Commercial Credit Corporation also wrote to Mr. Roberts, at the address aforesaid, stating that the policy had been cancelled as above mentioned; and we quote the following from this letter:

"On and after the date of such cancellation, you will be entirely without insurance protection· on your automobile. As you are required to furnish such protection for the benefit of Commercial Credit Corporation as well as yourself, you are requested to immediately arrange for replacement of this cancelled policy through your local Agent."

It is further stated in this letter as follows: "The return premium due for the cancellation of the Calvert Fire Insurance Company policy, has been credited to·your account"; it appearing that the amount of the unearned premium was $14.54. *And ·in this connection it should be stated that Mrs. Crotts specifically denied that she had ever received the letters addressed to Mr. Roberts relating to the purported cancellation of the policy.*

The next event in the chain of circumstances, and a very unfortunate one, was that on November 24, 1947, while the mother. of Mr. Crotts was driving the automobile in question there was a collision between the same and a car operated by some colored people, which resulted in serious damage to the plaintiff's automobile; indeed, it was almost completely destroyed. On the following day the plaintiff made a report of this collision to the Fletcher Motor Company.

Approximately a month after the collision Commercial Credit Corporation. sent an. insurance adjuster to see Mrs. Crotts with regard to the. matter, the testimony in behalf of the Credit Corporation being. to the effect that this was done "through error". At all events, the adjuster, G. W. Thompson,. who· did not testify, admittedly procured from the plain-

tiff in her original name of Virginia Rippy a non-waiver agreement, the essential portions of which are as follows:

"It is hereby agreed by and between the above-named assured and the insurance companies whose names are signed hereto that anything done or to be done by said insurance companies, or on their behalf, in connection with the above described loss, including any investigation into cause or amount of loss or damage, or other matter relative thereto, shall not waive, invalidate, forfeit or modify any of their rights under the terms and conditions of the respective policies issued by them.

This Agreement is made for the aid and convenience of the parties hereto, to permit investigation of the claim and ascertainment of appropriate values of and loss or damage to the property involved to be made without delay and without prejudice to any of their rights."

There is some testimony by the plaintiff as to the discussion between her and Mr. Thompson about the amount of the loss, but on or about January 15, 1948, a letter from Mr. Thompson was mailed to her, to the effect that the policy having been cancelled on November 6, 1947, which was prior to the accident, "the Calvert Fire Insurance Co. has directed us to advise you that they have no liability in connection with the claim and that their file is being closed."

It further appears from the evidence that after the cancellation date, to wit, November 6, 1947, specified in the notice, and also after the date of the collision, the plaintiff, Mrs. Crotts, some time in December, 1947, paid to Fletcher Motor Company, as the agent of Commercial Credit Corporation, an installment of $38.78 upon the chattel mortgage involved herein.

At the close of all the evidence in the case, counsel for the plaintiff moved the Court for a directed verdict in her favor. And at the same time counsel for the defendants moved for a directed verdict in their favor. As hereinbefore stated, Judge Mann directed a verdict in favor of the plaintiff, ex-

cept of course as to the amount of damages, submitting that issue to the jury, which rendered a verdict in favor of the plaintiff for the sum of $450.00. Thereafter and in due time counsel for the defendants made a motion for a new trial; and after the hearing thereof Judge Mann overruled the motion.

Thereupon due and timely notice of appeal was given by counsel for the defendants, appealing from Judge Mann's direction of verdict on March 7, 1949, and the verdict of the jury, and from his order dated July 6, 1949, overruling defendants' motion for a new trial; and also from the order of Judge Henderson dated October 20, 1948, overruling defendants' demurrer to the plaintiff's complaint.

There was no exception taken to the refusal of Judge Mann to direct a verdict in favor of the defendants, and there was no motion for a judgment *non obstante veredicto*. The exceptions are six in number, the first two of which charge Judge Henderson with error in overruling the demurrer. The third exception charges Judge Mann with error in overruling the motion for a new trial on the ground that the verdict of the jury for damages was excessive, and that they disregarded the rules of law as charged by the Presiding Judge. The other three exceptions, 4, 5 and 6, charge Judge Mann with error in the direction of a verdict in favor of the plaintiff; and these will hereinafter be discussed in some detail.

We shall first consider the exceptions charging Judge Henderson with error in overruling the demurrer interposed to the complaint by the defendants. It appears that after this order was filed counsel for the defendants gave notice of appeal to the Supreme Court from the same, but this appeal was not perfected, and the position taken by counsel for the plaintiff is that because the appeal was not perfected, the matter cannot now be reviewed by this Court. But we do not think this position is sound, in view of the statutory provisions contained in Code Sections

26 and 792. It is quite true that an interlocutory appeal may be taken to this Court from an order overruling a demurrer, but the failure to make or perfect such an appeal does not affect the right of this Court to review the matter in connection with an appeal from the final judgment. Code Section 792 provides that an appeal from a judgment or decree overruling a demurrer shall stay the further hearing of the cause, unless the Presiding Judge shall be satisfied that the ends of justice will be subserved by proceeding with the trial; and this section contains the following proviso: *"provided further, that nothing contained in the preceding proviso shall be construed to prevent a review upon appeal from the final order or judgment in the cause of any judgment or decree on demurrer."* See also Code Section 26 (D) (1).

The grounds of the defendants' demurrer as stated in the exceptions are (1) that the plaintiff was not a real party in interest and had insufficient legal interest in the subject matter to maintain the suit; and (2) that several causes of action had been improperly united.

In appellants' brief the first ground of the demurrer is said to be in effect that there was a defect of parties. And it is true that it appears upon the face of the complaint that in addition to the plaintiff, Edwin Y. Roberts should be made a party to the cause, but he was joined as a defendant, which was quite sufficient, especially in view of the answer subsequently filed by him, which is just as effective as if he had been made a party plaintiff. See Code Sections 404-406.

The other ground, to the effect that several causes of action were improperly united, we do not think is tenable, because there is really only one cause of action stated in the complaint, namely, the cause of action relating to the claim for automobile damages under the policy of insurance issued by the Calvert Fire Insurance Company.

We are therefore of opinion that the order of Judge Henderson overruling the demurrer should be, and it is hereby, *affirmed.*

In considering the exceptions of the defendants relating to the direction of a verdict in favor of the plaintiff, it should be said that the able and experienced trial Judge stated in considerable detail the reasons for his conclusion, the same being to the effect that notwithstanding the cancellation of the insurance policy, which he said was "good in the beginning", and that "if they had stopped there and stood on that act, and gone no further, why all would have been well for them", yet they (the defendants) did go further and by their conduct waived the cancellation of the policy, and should be held liable for the loss.

It is thus quite clear that Judge Mann based his ruling that a verdict should be directed in favor of the plaintiff upon the principle of waiver arising after the alleged cancellation. And the first matter to which Judge Mann adverts as showing waiver was the fact that an adjuster was sent to make an adjustment of the loss. But in considering this matter, we do not think he gave effect to the terms of the non-waiver agreement, which we have hereinbefore quoted, and which was admittedly signed by the plaintiff in her original name of Virginia Rippey.

We find nothing in the record impeaching the validity of this agreement, and we are of opinion that it should be given effect, according to its true intent and meaning, although it should be extended no further. But since by its terms it was made "to permit investigation of the claim and ascertainment of appropriate values of and loss or damage to the property involved", our conclusion is that the matters between the plaintiff and the adjuster, all of which related solely to the alleged ascertainment of the amount of the loss cannot be deemed to constitute waiver.

The rule is clearly and correctly stated in 45 C. J. S., Insurance, § 746, P. 756-757, as follows:

"The courts regard as valid and effective an express agreement entered into after loss and providing that certain acts in investigating or adjusting the loss shall not constitute a waiver.

"Although it must be given its fairly intended effect, a stipulation, either in the policy or in an agreement entered into after loss, the certain acts shall not constitute a waiver will not be extended by implication beyond its exact terms." See also *Joye v. South Carolina Mutual Ins Co.,* 54 S. C. 371, 32 S. E. 446.

However, as we interpret the decision of Judge Mann, the same was based principally upon his understanding that after the accident, and hence after the alleged cancellation of the insurance policy, there were subsequent payments on account of insurance, which have been accepted and retained would constitute waiver. But let us quote his own language, which is as follows:

"Now the Calvert Fire Insurance Company appointed the Commercial Credit Corporation to look after its affairs down here in the procuring of that insurance and whatever, as I see the law, the Commercial Credit Corporation does with respect to that policy, they are acting for the Insurance Company, and when the Commercial Credit Corporation, whether they so intended to do or not, received subsequent payments of $38.78, after the cancellation of that insurance policy, that insurance money was in their hands and it does not make any difference what the Commercial Credit Corporation called it, or how they applied it, it belonged to the insurance company; they held it as trustee for the insurance company as insurance money as long as they had it, and as long as they had any of the owner's money, the owner of the automobile, he was insured, as long as they had any part of it."

In the interest of accuracy, it should be observed that the evidence is clear that there was but *one* payment made after the purported cancellation, although the principle of course is the stame.

Considering the quoted words of Judge Mann, if the evidence had conclusively shown that this particular payment was in fact *"insurance money"*, then the statement of the Court would be correct. But the test is, did this installment payment of $38.78 cover any money whatsover which belonged to the insurance company or in which that company had any interest? The evidence is definite to the effect that this question should be answered in the negative; for the testimony plainly indicates that the Calvert Fire Insurance Company had no interest whatever in the installment payments made or to be made by the purchaser of the automobile on account of the note and chattel mortgage held by the Commercial Credit Corporation, because the full amount of the insurance premium was paid at the time of the delivery of the policy. And certainly the Commercial Credit Corporation had the right to receive payments on the note and chattel mortgage, notwithstanding any alleged cancellation of the insurance policy, and notwithstanding the practical destruction of the automobile. In fact, the chattel mortgage itself contains a stipulation, as follows: "The loss, injury or destruction of said Car shall not release Purchaser from the payment of said Note."

Nevertheless, we think there is a sound and substantial reason why the trial Judge's direction of a verdict in favor of the plaintiff should be sustained; namely, that the cancellation of the insurance policy never became effective, because the Insurance Company failed to tender or refund the unearned portion of the premium to the insured (or the plaintiff), as required by the policy but on the contrary, without authority, issued a credit memorandum for the amount to the Credit Corporation, which likewise, without authority, listed the same as a credit on the chattel mort-

gage. And in this connection we quote the following from the policy:

"If the company cancels, earned premiums shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected and, if not then made, shall be made as soon as practicable after cancellation becomes effective. The company's check or the check of its representative mailed or delivered as aforesaid shall be sufficient tender of any refund of premium due to the insured."

Furthermore, the Credit Corporation had no lien whatsoever on the unearned portion of the insurance premium; although it did have a prior and preferred purchase money lien upon any amount payable because of loss under the terms of the insurance policy, as will definitely appear by reference to the following quotation from the chattel mortgage:

"Purchaser hereby assigns to Seller or his assignee all monies not in excess of the unpaid balance hereunder payable under such Insurance, and directs any Insurer to make payment direct to the holder hereof, and appoints said holder as Attorney in Fact to endorse any draft."

As will appear by reference to our own case of *Hamilton Ridge Lumber Corporation v. Boston Insurance Company*, 133 S. C. 472, 131 S. E. 22, 25, "the tender of the unearned premium is a condition precedent to the cancellation" of an insurance policy. And quoting further from the leading opinion delivered by Mr. Justice Cothran: "This view is entirely in accord with the decisions of this court to the effect that, where a party seeks relief from a contract into which he has entered, he must first return all benefit which he has received." This case is cited as stating the correct and controlling principle, but not as being in point upon the peculiar facts of the case at bar.

We are of opinion that the conclusion we have reached, as above indicated is sufficiently supported by the written instruments involved, as reasonably construed, without au-

thority from elsewhere. But, as will appear by reference to the annotation in 127 A. L. R. 1358-1359, there are certain cases from other jurisdictions, therein cited, to the effect that an insurer cannot refund an unearned premium by crediting it on some other indebtedness owed to the insurer by the insured, nor can the refund be made effective by applying it on the account which the insured may owe the insurer's agent.

A Texas case in point is that of *Seaboard Fire & Marine Insurance Co. v. Hines,* Tex. Civ. App., 142 S. W. (2d) 538, wherein the holding is correctly set forth in a syllabus as follows: "Where agent for fire insurer paid amount of premium, less agent's commission, and extended credit to insured for premium as an obligation due agent, and agent, who was not satisfied with premium payments of insured and who had custody of policy which permitted cancellation by insurer upon five days' written notice and return of unearned portion of premium, returned policy to insurer which, at agent's request, canceled policy and returned unearned premium to agent, attempted cancellation was not effectual as to insured, since insurer could not cancel policy without returning or tendering to insured the unearned portion of premium."

The New York case of *B X Corporation v. Aetna Insurance Company,* 187 Misc. 806, 63 N. Y. S. (2d) 14, also adds strong support, and in which the holding of the Court is accurately stated in a syllabus as follows: "Where neither mortgage nor statutory provision regarding mortgagor's duty to keep mortgaged buildings insured specifically pledged unearned premiums to mortgagee, unearned premiums, on cancellation of fire insurance as requested by finance corporation which had made premium loan, belonged to mortgagor, and mortgagee was not entitled thereto on theory that it had a lien which attached to unearned premiums."

While we think the weight of authority, as well as of reason, sustains the views we have expressed, we observe the

Arkansas case of *Home Insurance Co. of N. Y. v. Jones,* 192 Ark. 916, 95 S. W. (2d) 894, which appears to be *contra,* but there is very little discussion of this feature of the case in the opinion. And attention may also be directed to the New Mexico case of *Gendron v. Calvert Fire Insurance Company,* 47 N. M. 348, 143 P. (2d) 462, 149 A. L. R. 1310, where a result different from ours was reached, but in that case there was a significant difference in the terms of the policy, and the Court adverts to the fact that the refund of premium provided for was dependent upon a "surrender of the policy"; and there is no such condition in the policy before us.

We are of course well aware that this point was not considered by Judge Mann, although he does make some incidental reference to the refund of an unearned premium. Nor did counsel raise the point below or in this Court; and no sustaining ground was filed. However, in the furtherance of Justice we think this is an appropriate case for the exercise of the right reserved to this Court "to sustain any ruling, order or judgment upon any grounds appearing in the record". Section 8, Rule 4, Supreme Court.

There remains, however, for consideration exception 3, charging the trial Judge with error in overruling defendents motion for a new trial on the ground that the verdict was excessive and that the jury disregarded the trial Judge's charge as to the law. The purchase price of the automobile was the sum of $595.00 when it was acquired on March 4, 1947, and on the 24th day of November, 1947, a little more than eight months thereafter, the car was involved in a collision; and, as it is frankly stated in appellants' brief, "the automobile was practically destroyed". The verdict of the jury as to the actual cash value of the car before it was wrecked is clearly supported by the evidence in the record. And the Judge's charge was not subject to any objection, except in one particular, which seems to have been overlooked by all concerned, to wit, that the amount of the insurance was "Actual Cash Value less $50.00," and the jury

was not instructed to deduct the sum of $50.00 from the value as found by them.

But it is clear that, to the end that justice may be done, the affirmance of the judgment should be *upon the condition* that the plaintiff shall deduct this item of $50.00 from the same. And there is another matter, which was in fact alluded to by Judge Mann, namely, that the Commercial Credit Corporation having a lien on the insurance money to the extent of the balance due on the chattel mortgage, *as a further condition* of affirmance, the plaintiff shall, out of the proceeds of the judgment, pay to the Commercial Credit Corporation this balance, whereupon the chattel mortgage shall be satisfied; the balance being alleged in the answer as $25.47, with interest from December 20, 1947, but this amount should of course be increased by the elimination of the improper credit of $14.54, relating to the erroneously claimed "unearned premium", to which reference has hereinbefore been made.

Accordingly, subject to the conditions aforesaid, the judgment of the Circuit Court is,

Affirmed.

FISHBURNE, STUKES, TAYLOR and OXNER, JJ., concur.